UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL SACHELL, | ) | |
| | ) | |
| Plaintiff, | ) | 19 C 4597 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| FAUZIA KHAN, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Michael Sachell brought this suit against Dr. Fauzia Khan under 42 U.S.C. § 1983 and Illinois law, alleging deliberate indifference to his medical needs in violation of the Eighth Amendment and medical malpractice. Doc. 45. (Sachell's claims against Cook County Sheriff Thomas Dart and Cook County have been dismissed by stipulation. Doc. 162.) With discovery closed, Dr. Khan moves for summary judgment, Doc. 146, and to bar the testimony of Sachell's expert witness, Doc. 144. The summary judgment motion is denied, and the motion to bar is granted in part and denied in part.

## Background

The court recites the facts as favorably to Sachell as the record and Local Rule 56.1 allow. *See Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). At this juncture, the court must assume the truth of those facts, but does not vouch for them. *See Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

At all relevant times, Sachell was a convicted inmate serving out his sentence at Cook County Jail. Doc. 166 at ¶ 1. Sachell has hypertension and a history of heart valve repair and pulmonary embolism. Doc. 168 at ¶ 4. Due to those conditions, he takes a combination

anticoagulant therapy—commonly called blood thinners—of Xarelto and aspirin. *Id*. at ¶ 5; Doc. 166 at ¶ 10. The medications increase Sachell's risk of bleeding. Doc. 166 at ¶ 10; Doc. 168 at ¶¶ 5, 9.

Dr. Khan is a clinical dentist at Cook County Jail. Doc. 166 at ¶ 2; Doc. 168 at ¶ 3. At the time she treated Sachell, Dr. Khan had over eighteen years of experience practicing dentistry in a clinical setting, and she had never been disciplined by any employer, board, or licensing committee. Doc. 166 at ¶¶ 8-9. Dr. Khan is the only dentist at the Jail assigned to treat patients taking anticoagulants, and the treatment of those patients requires oversight from physicians and other medical professionals. Doc. 168 at ¶ 3. In July 2018, Dr. Khan complained to her supervisor about understaffing—an issue that she later said was not resolved—and she has explained that she was overloaded with patients, especially medically fragile ones. *Id*. at ¶¶ 1, 3.

Dr. Khan first evaluated Sachell on February 8, 2019. *Id*. at ¶ 6; Doc. 166 at ¶ 11. Sachell told Dr. Khan that he was taking anticoagulants that caused him to bleed easily, Doc. 168 at ¶ 9, and she claims that she reviewed his medical history and saw that he was on the medications, Doc. 166 at ¶ 11. Dr. Khan observed that Sachell had several decaying teeth and recommended teeth extractions. *Id*. at ¶ 12. Dr. Khan also performed a periodontal examination, which caused Sachell to bleed severely. Doc. 168 at ¶ 6.

On February 25, Sachell had a second visit with Dr. Khan. *Id*. at ¶ 7. Sachell reiterated that he was on anticoagulants. *Id*. at ¶ 9. Dr. Khan again performed an oral examination and recommended the surgical extraction of two teeth (teeth 2 and 3) and two roots (teeth 4 and 5). *Id*. at ¶ 7; Doc. 166 at ¶ 16; Doc. 158-3 at 4. Sachell agreed, and Dr. Khan performed the surgical extractions that day. Doc. 166 at ¶ 20. Surgical extractions are more invasive than simple extractions, requiring the cutting of bone and entailing an increased risk of bleeding

during and after the procedure. Doc. 168 at ¶ 7. The risk of bleeding is even greater when multiple teeth are surgically extracted and when the patient is on anticoagulants. *Id*. at ¶ 33.

Records indicate that there were no complications during the surgery and that Sachell achieved hemostasis—meaning that he was not experiencing any abnormal bleeding—following the procedure. Doc. 166 at ¶ 21. According to Sachell, Dr. Khan did not use sutures to stitch his extraction wounds and instead provided gauze to cover them. Doc. 168 at ¶ 39. Records do not note that sutures were used, and Dr. Khan and her dental assistant testified at their depositions that the use of sutures would ordinarily be documented. *Id*. at ¶ 10; Doc. 169 at ¶ 10.

Sachell was bleeding following the extractions, though he does not say how heavily. Doc. 168 at ¶ 9. The bleeding continued the following two days, on February 26 and 27. *Id*. at ¶ 31. On February 27, Sachell frequently changed out the gauze because it kept getting soaked through with blood. *Id*. at ¶¶ 12, 31. Sachell recounts that the extraction site as of February 27 was still "a big hole." *Id*. at ¶ 12; Doc. 147-4 at 34 (130:8-131:15).

On February 7—the day before Sachell's first appointment—Dr. Khan had prescribed a chlorhexidine oral rinse as part of a pre-operative treatment plan. Doc. 168 at ¶ 13; Doc. 169 at ¶ 13. The order instructions directed Sachell to "swish and spit" the rinse. Doc. 168 at ¶ 13. Although Dr. Khan says that the oral rinse was for pre-operation use, records indicate that Sachell continued to receive the rinse multiple times per day after his surgery, through at least March 3. *Ibid*. Dr. Khan also testified that she "may have" prescribed Sachell the oral rinse after the extractions, though she does not recall whether she in fact did so, and she does not say whether she would have instructed him to swish and spit the rinse at that juncture. Doc. 166-1 at 40 (156:3-9); Doc. 169 at ¶ 24.

On March 4, at about 2:00 a.m., Sachell's mouth began to bleed heavily. Doc. 168 at ¶ 15. At about 4:30 a.m., a nurse provided Sachell with the chlorhexidine rinse, which he used while continually spitting out blood into a trash can. Doc. 166 at ¶ 29; Doc. 147-4 at 35 (136:24-137:17).

At about 11:00 a.m., Sachell met with Dr. Gregory Haman, who noted that he had gauze in his mouth that, when removed, showed a "slow drip of blood." Doc. 166 at ¶¶ 31-32. Dr. Haman conferred with Dr. Khan, and they decided to refer Sachell to an urgent care clinic for his bleeding and reports of chest pain. *Id.* at ¶¶ 35-36. At 3:40 p.m., an urgent care physician noted "trace scabbing on gum line of teeth 2-5, no active bleeding, sutures in place at approximately tooth 2." *Id.* at ¶ 36. Later that day, Sachell was sent to Stroger Hospital and seen by Dr. James Murphy, who noted that his bleeding had ceased after six hours of gauze pressure. *Id.* at ¶ 37. On March 5, Dr. Murphy determined that no additional dental treatment was necessary because Sachell had achieved hemostasis. *Id.* at ¶ 40. On March 7, a physician discontinued Sachell's use of aspirin and continued him on Xarelto only. Doc. 168 at ¶ 34.

## Discussion

Dr. Khan moves to bar the opinions of Sachell's expert witness, Dr. Anita Lockhart, and for summary judgment on his two claims.

## I.    Motion to Bar

Dr. Lockhart is a dentist and administrator with the Federal Bureau of Prisons. Doc. 144-2 at 16 (58:20-59:8). Sachell offers Dr. Lockhart as an expert on (a) the standard of care for a correctional facility dentist treating a patient on anticoagulants and (b) Dr. Khan's treatment of Sachell. Doc. 144-1. Dr. Khan moves under Evidence Rule 702 to bar four of Dr. Lockhart's opinions. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-95

(1993); *Lees v. Carthage Coll.*, 714 F.3d 516, 521 (7th Cir. 2013) ("[T]he *Daubert* analysis

applies to *all* expert testimony under Rule 702, not just scientific testimony.") (citing *Kumho*

*Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)).

Rule 702 provides: "A witness who is qualified as an expert by knowledge, skill,

experience, training, or education may testify in the form of an opinion or otherwise if: (a) the

expert's scientific, technical, or other specialized knowledge will help the trier of fact to

understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient

facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the

expert has reliably applied the principles and methods to the facts of the case." Fed. R.

Evid. 702. The district court serves as the "gate-keeper who determines whether proffered expert

testimony is reliable and relevant before accepting a witness as an expert," *Winters v. Fru-Con*

*Inc.*, 498 F.3d 734, 741 (7th Cir. 2007) (internal quotation marks omitted), and "has 'broad

latitude' to determine how to evaluate expert testimony," *United States v. Hill*, 818 F.3d 289, 297

(7th Cir. 2016) (quoting *Kumho Tire*, 526 U.S. at 153). The expert's proponent bears the burden

of proving by a preponderance of the evidence that the expert's testimony satisfies Rule 702.

*See United States v. Saunders*, 826 F.3d 363, 368-69 (7th Cir. 2016); *Lewis v. CITGO Petroleum*

*Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

First, Dr. Lockhart opines that Sachell suffered excessive bleeding due to Dr. Khan's

failure to undertake certain intraoperative procedures. Doc. 144-1 at 33, 37. Specifically,

Dr. Lockhart opines that procedures such as suturing and surgical packing can help achieve and

maintain blood clots, though suturing is the only procedure that, in her view, was absolutely

necessary in Sachell's case. *Id*. at 33; Doc. 144-2 at 69, 78 (273:10-13, 307:12-308:12). Dr.

Khan contends that this opinion is unreliable because it is not based on facts in the record—

specifically because, in her view, the record demonstrates that she in fact used sutures. Doc. 144 at 9-10. Dr. Khan adds that record evidence shows that Sachell had obtained hemostasis following the surgical extractions and that bleeding is not uncommon following such extractions—evidence, she says, that Dr. Lockhart did not account for and that shows that she did not cause Sachell's alleged injuries. *Ibid*.

Dr. Khan is correct that expert testimony is reliable only if is appropriately tethered to the facts of the case. *See Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) ("Federal Rule of Evidence 702 allows an expert witness to testify about a relevant scientific issue in contention if his testimony is based on sufficient data and is the product of a reliable methodology correctly applied to the facts of the case."). Even so, "the soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.*, 782 F.3d 353, 360 (7th Cir. 2015) (internal quotation marks omitted); *see also Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) ("Reliability … is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced."). Here, some record evidence indicates that Dr. Khan used sutures (the note from the urgent care clinic) while other evidence indicates that she did not (statements from Sachell, Dr. Khan, and Dr. Khan's dental assistant). Given this factual dispute, Dr. Lockhart's submission that Dr. Khan did not use sutures does not render her opinion unreliable. Instead, it is for the jury to weigh the conflicting evidence on that issue and make a determination. *See Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) ("The jury must … be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony."). Likewise, it is for the jury to decide whether the other

evidence cited by Dr. Khan—that Sachell had achieved hemostasis and that bleeding is common following surgical extractions—undermines Dr. Lockhart's conclusion that Dr. Khan's failure to properly treat Sachell caused him to bleed excessively.

Second, Dr. Lockhart opines that the standard of care requires a correctional dentist to consult with a physician prior to performing surgical extractions of teeth on patients taking anticoagulants. Doc. 144-1 at 7. Dr. Khan contends that Dr. Lockhart is unqualified to offer that opinion and that the opinion will not help the factfinder determine whether any breach of the standard of care caused harm to Sachell. Doc. 144 at 5-8.

Dr. Khan is wrong to assert that Dr. Lockhart is unqualified to opine that the standard of care requires a correctional dentist to consult with a physician in these circumstances. Dr. Khan's argument rests on the premise that Dr. Lockhart cannot say what a consulting physician would have recommended; for example, Dr. Lockhart concedes that she does not know whether a physician would have recommended halting Sachell's use of anticoagulants before the procedure. *Id*. at 6. The argument is a strawman, for Dr. Lockhart does not purport to be qualified to say what a consulting physician would have recommended. Doc. 166 at ¶ 58. Dr. Lockhart maintains only that obtaining a consultation is important in order to inform the dentist's clinical judgment and possibly to test the patient's platelet function before surgery. *Ibid*.; Doc. 168 at ¶ 11. Dr. Lockhart, a dentist, is qualified to opine simply that a dentist should seek a physician consult in those circumstances.

Whether that opinion will help a jury determine a material fact at issue is another story. Under Rule 702, there must "be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003). Sachell's claims require him to show that Dr. Khan's treatment caused

him to suffer harm. Doc. 165 at 3. But Dr. Lockhart admits that she cannot say how, if at all, a physician consult might have altered Dr. Khan's treatment of Sachell. Doc. 166 at ¶ 58. Nor would other record evidence allow a jury to find that a consult would have altered that treatment. Therefore, whether Dr. Khan should have sought a physician consult ultimately has no bearing on the merits of Sachell's claims. Put differently, there is an irreconcilable factual gap between Dr. Khan's failure to consult and Sachell's alleged harm, making testimony as to the former unhelpful to the factfinder. *See United States v. Gallardo*, 497 F.3d 727, 733 (7th Cir. 2007) (holding that expert testimony that drugs could have affected witnesses' memories was not helpful under Rule 702 because there was no evidence that the witnesses were using drugs when they observed the events in question); *cf.* Fed. R. Evid. 104(b) ("When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist.").

Resisting this conclusion, Sachell suggests that a consulting physician might have recommended adjusting Sachell's anticoagulant regimen prior to the surgery. Doc. 167 at 11. Dr. Khan herself recognized that very possibility in an August 2016 presentation she gave on treating patients who are taking anticoagulants. Doc. 168 at ¶ 21. But Dr. Lockhart does not opine, nor does any other evidence suggest, that a consulting physician would have recommended adjusting Sachell's anticoagulant regimen or that doing so would have improved his post-surgery outcome. Doc. 144-1 at 20-21. The factfinder therefore would be left to speculate on the outcome of any physician consult.

Sachell also contends that Dr. Lockhart's opinion is relevant to the standard of care element of his state law medical malpractice claim. Doc. 158 at 7-9. True enough, "[n]o one piece of evidence has to prove every element of the plaintiff['s] case." *Adams v. Ameritech*

*Servs., Inc.*, 231 F.3d 414, 425 (7th Cir. 2000); *see also Smith v. Ford Motor Co.*, 215 F.3d 713, 721 (7th Cir. 2000) ("[E]xpert testimony need only be relevant to an issue in the case; it need not relate directly to the ultimate issue."). Here, Dr. Lockhart's opinion that the standard of care required a physician consult in these circumstances would be helpful if other evidence could show that the failure to consult caused Sachell's alleged injuries. But as explained, there is no evidence that the failure to consult caused those injuries. Whether the standard of care required a physician consult is therefore not a "fact in issue," Fed. R. Evid. 702(a), and its determination will not help resolve whether Dr. Khan caused Sachell any harm. *See Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."). That opinion therefore is inadmissible.

Third, Dr. Khan argues that Dr. Lockhart is unqualified to opine whether a drop in Sachell's hemoglobin levels indicates that he suffered excessive bleeding. Doc. 144 at 10-13. At her deposition, Dr. Lockhart admitted that she cannot speak to the cause of the drop in Sachell's hemoglobin levels. Doc. 144-2 at 71-72 (281:1-283:18). And in response to Dr. Khan's motion to bar, Sachell agrees that Dr. Lockhart will not offer testimony about the possible causes of a drop in hemoglobin other than that "it may occur because of dental bleeding." Doc. 158 at 14. Sachell has therefore conceded that Dr. Lockhart cannot testify that a drop in hemoglobin levels indicates that he suffered excessive bleeding.

Given that Dr. Lockhart will not testify about the cause of a drop in Sachell's hemoglobin levels, Dr. Khan urges the court to go a step further and hold that Dr. Lockhart cannot testify that Sachell had excessive bleeding at all. Doc. 144 at 13; Doc. 165 at 9-10. That argument fails, as Dr. Lockhart points to other facts indicating that Sachell experienced an unusual amount of bleeding. Specifically, Dr. Lockhart opines that the use of gauze seven days after the extractions

is "not normal" and that "one should not be able to see" blood "'dripping' of any kind this many days later, slow or otherwise." Doc. 144-1 at 34.

Fourth, Dr. Khan objects to Dr. Lockhart's attempt to "incorporate" her opinions from a report she prepared for another case. Doc. 144 at 13-15. Sachell agrees that Dr. Lockhart will not attempt to incorporate the report. Doc. 158 at 14.

In sum, Dr. Khan's motion to bar is granted as to Dr. Lockhart's opinions that the failure to obtain a physician consult caused Sachell's excessive bleeding and that Sachell's drop in hemoglobin levels is indicative of excessive bleeding. The motion also is granted as to Dr. Lockhart's attempt to incorporate the opinion she prepared for a separate case. The motion is denied as to Dr. Lockhart's opinion that Dr. Khan's failure to adhere to certain intraoperative procedures caused Sachell's injuries.

## II.    Summary Judgment Motion

As noted, Sachell brings an Eighth Amendment deliberate indifference claim and a state law medical malpractice claim. In seeking summary judgment, Dr. Khan contends that there is insufficient evidence to sustain either claim.

### A.    Deliberate Indifference Claim

"If prison medical staff exhibit deliberate indifference to an inmate's serious medical condition, they subject h[im] to unnecessary and wanton pain and suffering and thereby run afoul of the Eighth Amendment." *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018). "To establish an Eighth Amendment claim for deliberate indifference to serious medical needs, … [t]he plaintiff must prove that he suffered from (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019) (internal quotation marks omitted).

"An objectively serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Gayton*, 593 F.3d at 620 (internal quotation marks omitted). "A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Ibid.*; *see also Reed v. McBride*, 178 F.3d 849, 852-53 (7th Cir. 1999). Sachell's need for surgical teeth extractions—and the excessive bleeding that followed—qualify as objectively serious medical conditions requiring attention from a medical professional. *See Green v. Beth*, 663 F. App'x 471, 473 (7th Cir. 2016) (holding that damaged teeth, bleeding, and pain caused by foreign objects in food was an objectively serious medical condition); *Board v. Farnham*, 394 F.3d 469, 480 (7th Cir. 2005) ("[A] number of other courts have … held that dental pain accompanied by various degrees of attenuated medical harm may constitute an objectively serious medical need.").

The subjective element of a deliberate indifference claim requires a plaintiff to "show that the defendant '*actually* knew of and disregarded a substantial risk of harm.'" *Mitchell*, 895 F.3d at 498 (quoting *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc)); *see also Cesal v. Moats*, 851 F.3d 714, 721 (7th Cir. 2017) ("A failure to act in the face of an obvious risk of which the official *should* have known is insufficient to make out a claim."). Under that standard, "[t]he defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). "By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment."

11

*Ibid.* (quoting *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016)).  That said, "[i]f a risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it." *Petties*, 836 F.3d at 729.  In that situation, a "medical professional's treatment decision must be such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Ibid.* (internal quotation marks omitted).  The court looks to "the totality of an inmate's medical care when determining whether prison officials have been deliberately indifferent to an inmate's serious medical needs." *Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000).

The record supports a reasonable inference that Dr. Khan knew of and, in the course of treatment, disregarded a substantial risk of harm to Sachell.  Sachell told Dr. Khan that he was on anticoagulants, and Dr. Khan claims that she was aware of the fact.  Doc. 166 at ¶ 11; Doc. 168 at ¶ 9.  During the initial examination, Dr. Khan noted that Sachell experienced severe bleeding from a periodontal examination.  Doc. 168 at ¶ 6.  At the time, Dr. Khan had practiced dentistry for eighteen years, and she was the only dentist at the Jail who treated patients on anticoagulants. *Id*. at ¶ 3.  Dr. Lockhart opines that any minimally competent dentist—let alone one with Dr. Khan's experience—should have taken extra precautions, including the use of sutures, in performing surgical extractions on a patient who, like Sachell, is on anticoagulants.  Doc. 144-1 at 22, 35.  Dr. Khan's August 2016 presentation provides further evidence that she in fact knew that extra precautions were necessary in performing surgical extractions for multiple teeth on such patients.  Doc. 168 at ¶ 21.  Yet there are no indications that Dr. Khan took any special precautions; she surgically extracted a row of four teeth, did not use sutures, and provided Sachell with only gauze to stem any bleeding.  *Id*. at ¶¶ 30-31, 39.  Those facts, viewed in the

light most favorable to Sachell, establish that Dr. Khan knew of and disregarded a substantial risk of harm to him. *See Berry v. Peterman*, 604 F.3d 435, 441-42 (7th Cir. 2010) (reversing a grant of summary judgment to a jail doctor who took the "easier" path of prescribing ineffective pain medication rather than the "obvious alternative" of referring the plaintiff to a dentist after his repeated reports of pain).

Dr. Khan insists that the evidence shows that she exercised her professional judgment in treating Sachell. At both visits, Dr. Khan reviewed his medical history, performed oral examinations, and took X-rays. Doc. 148 at 5. She recommended a treatment plan and obtained Sachell's consent to proceed. *Id*. at 5-6. And given that Sachell had achieved hemostasis following the extractions—at least according to the records from the procedure—Dr. Khan contends that she exercised her professional judgment to determine that precautions such as sutures were unnecessary. Doc. 147 at ¶ 50; Doc. 147-2 at 160 (159:6-10).

Dr. Khan's submissions run contrary to Dr. Lockhart's opinion that sutures are absolutely necessary when four adjacent surgical extractions are performed on any patient, let alone one on anticoagulants. Doc. 144-2 at 78 (307:12-308:12). The court cannot resolve on summary judgment whether Dr. Khan or Dr. Lockhart is correct on that score. And as explained, the court looks to the totality of an inmate's medical care in assessing a deliberate indifference claim. *See Walker*, 233 F.3d at 501. That Dr. Khan's treatment of Sachell may have been adequate in some regards does not preclude the possibility that her other treatment decisions were "so blatantly inappropriate" as to amount to deliberate indifference. *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996); *see also Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005) (explaining that the fact that a patient receives "*some* treatment" does not bar a deliberate indifference claim). Here, a

jury could conclude that the failure to use sutures was such a substantial departure from accepted practice that it amounted to no professional judgment at all.

The final issue on Sachell's deliberate indifference claim is whether there is evidence that Dr. Khan's allegedly deficient treatment caused him harm. There is. Dr. Lockhart opines that Sachell experienced excessive bleeding as a result of Dr. Khan's deficient treatment. Although, as noted, Sachell cannot rely on his drop in hemoglobin levels to establish that his blood loss was excessive, Dr. Lockhart bases the conclusion that his bleeding was excessive on other facts: she says that the use of gauze seven days after the extractions is "not normal" and that "one should not be able to see" blood "'dripping' of any kind this many days later, slow or otherwise." Doc. 144-1 at 34. The record indicates that Sachell had to apply pressure with gauze for six hours on March 4 to stem the bleeding. Doc. 166 at ¶ 37. The unusual amount of bleeding a week after the extractions permits a reasonable inference that Sachell was harmed due to Dr. Khan's deliberate indifference.

Dr. Khan contends that the evidence is incompatible with a conclusion that Sachell was harmed due to her treatment. In support, she observes that post-operation bleeding is common after surgical extractions and that there is evidence that Sachell achieved hemostasis following the extractions. Doc. 170 at 9. It is more likely, Dr. Khan posits, that other events are to blame for Sachell's bleeding—specifically, there is evidence that Sachell purchased and ate crunchy snacks from the Jail commissary the day following the surgical extractions and that he felt the extraction wound with his tongue. Doc. 166 at ¶¶ 23, 26.

Dr. Khan's argument is surely grist for trial, but at this juncture, the court must view the evidence in the light most favorable to Sachell. Dr. Khan provides no evidence, expert or otherwise, that her alleged failure to use sutures could not have resulted in the commencement of

excessive bleeding a week after the extractions. Indeed, Dr. Murphy testified that post-operative bleeding for patients taking anticoagulants "can be delayed" for "a period of days" or even "weeks." Doc. 169 at ¶ 28. Moreover, there is evidence that Dr. Khan failed to stop Sachell's regimen of swishing and spitting chlorhexidine, Doc. 168 at ¶ 13, and that she may have prescribed the oral rinse again after the extractions, Doc. 166-1 at 40 (156:3-9). Dr. Lockhart explains that swishing and spitting chlorhexidine after surgical extractions is an "absolute contraindication" for patients on anticoagulants because it can "prevent[] blood clots [from] forming or staying in place." Doc. 144-1 at 22.

For these reasons, the record would allow a reasonable jury to find that Dr. Khan's deliberate indifference caused Sachell's excessive bleeding.

### B. Medical Malpractice Claim

"In a medical malpractice action, the plaintiff must prove the following elements: (1) the proper standard of care against which the defendant physician's conduct is measured; (2) an unskilled or negligent failure to comply with that standard; and (3) a resulting injury proximately caused by the physician's want of skill or care." *Perkey v. Portes-Jarol*, 1 N.E.3d 5, 13 (Ill. App. 2013). "A plaintiff must prove these elements by presenting expert medical testimony," *Stanphill v. Ortberg*, 91 N.E.3d 928, 937 (Ill. App. 2017), except where a "professional's conduct is so grossly negligent or the treatment so common that a layperson could readily appraise it," *Advincula v. United Blood Servs.*, 678 N.E.2d 1009, 1021 (Ill. 1996).

Dr. Lockhart's expert testimony provides an evidentiary basis for the proper standard of care. As noted, Dr. Lockhart opines that the standard of care required Dr. Khan to use sutures and that swishing and spitting chlorhexidine is a contraindication for patients on anticoagulants after undergoing surgical extractions. Doc. 144-1 at 22, 33.

There is likewise an evidentiary basis for a jury to find that Dr. Khan breached the standard of care. A reasonable factfinder could conclude that Dr. Khan failed to use sutures despite carrying out four adjacent surgical extractions on a patient who she knew was on anticoagulants. A reasonable factfinder could also infer that Sachell continued to swish and spit chlorhexidine because Dr. Khan maintained him on the oral rinse after the operation.

The last element is whether Dr. Khan's treatment proximately caused Sachell's injuries. "The term 'proximate cause' encompasses two distinct requirements: cause in fact and legal cause." *Young v. Bryco Arms*, 821 N.E.2d 1078, 1085 (Ill. 2004). "Cause in fact exists only if the defendant's conduct was a 'material element and a substantial factor in bringing about the injury.'" *TIG Ins. Co. v. Giffin Winning Cohen & Bodewes, P.C.*, 444 F.3d 587, 591 (7th Cir. 2006) (Illinois law). For medical malpractice claims, cause in fact requires a "plaintiff to establish, to a reasonable degree of medical certainty, that the defendant's malpractice more probably than not caused his or her injury." *Scardina v. Nam*, 775 N.E.2d 16, 24 (Ill. App. 2002). "Legal cause is established if an injury was foreseeable as the type of harm that a reasonable person would expect to see as a likely result of his or her conduct." *Crumpton v. Walgreen Co.*, 871 N.E.2d 905, 910 (Ill. App. 2007).

Sachell presents sufficient evidence of proximate cause. Dr. Lockhart opines that Sachell experienced excessive bleeding one week after Dr. Khan failed to suture his extraction wounds. That would allow a reasonable jury to find, with the requisite degree of medical certainty, that Dr. Khan's failure to adhere to the standard of care caused the excessive bleeding. And given Dr. Lockhart's testimony, a reasonable jury could find that it was foreseeable that Dr. Khan's failure to suture the extraction wounds could result in excessive bleeding. Sachell's medical malpractice claim accordingly survives summary judgment.

* * *

Before concluding, a brief note on Dr. Murphy's deposition testimony is in order. Sachell argues that Dr. Khan's summary judgment motion attempts to rely on Dr. Murphy's testimony as expert testimony even though (Sachell contends) Dr. Murphy is not qualified to serve as an expert witness and even though Dr. Khan failed to disclose him as an expert under Civil Rule 26(a)(2). Doc. 167 at 6-7. Dr. Khan does not reply to Sachell's contention. Doc. 170. Consequently, Dr. Khan has forfeited any reliance on Dr. Murphy as an expert witness for purposes of the present summary judgment motion. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument … results in waiver.").

## Conclusion

Dr. Khan's motion for summary judgment is denied, and her motion to bar Dr. Lockhart's expert opinions is granted in part and denied in part. This case will proceed to trial on Sachell's deliberate indifference and medical malpractice claims.

August 30, 2022

_____
United States District Judge